STATE, Respondent, v. WASTE MANAGEMENT OF WISCONSIN, INC., d/b/a City Disposal Company, Appellant.†

*No. 75–412–CR. Argued October 31, 1977.—*
*Decided January 3, 1978.*
(Also reported in 261 N.W.2d 147.)

† Motion for rehearing denied, without costs, on March 3, 1978.

556

557

558

For the appellant there were briefs by *Robert H. Friebert, D. Jeffrey Hirschberg* and *Friebert & Finerty* and oral argument by *Robert H. Friebert,* all of Milwaukee.

For the respondent the cause was argued by *Alan M. Lee,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *William L. Gansner,* assistant attorney general.

ROBERT W. HANSEN, J. An appellate court is not a performing bear, required to dance to each and every tune played on an appeal. Here appellant raises twenty-nine challenges to a judgment of conviction. However, we find the challenges to fit into five categories and will discuss each category. Any of the twenty-nine issues raised and not discussed in any of the five categories can be deemed to lack sufficient merit or importance to warrant individual attention.

I. *CHALLENGES TO SUFFICIENCY OF INDICTMENT.*

The indictment by the grand jury stated that "the offense charged and the acts stated were contrary to sec.

133.01(1) and (3), Stats."[1] Subsection (1) contains six sentences. Only the first two are here involved. The first sentence declares illegal every "contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce." The second sentence declares "[e]very combination, conspiracy, trust, pool, agreement or contract intended to restrain or prevent competition *in the supply or price of any article or commodity . . .*" to be an illegal restraint of trade. [Emphasis supplied.]

The charging portion of the indictment charged that the defendants and the coconspirators "did feloniously engage in an unlawful combination and conspiracy intended to restrain competition in the supply or price of an article or commodity." Before the first trial,[2] the Honorable W. L. JACKMAN held that waste removal was not "an article or commodity" and therefore was not within the scope of the second sentence, but that the indictment alleged acts which, "if true, would constitute a violation of sec. 133.01(1), particularly, the first sentence." Before the second trial, the trial judge, the Honorable NORRIS MALONEY, granted the state's motion to amend the indictment to state that "the defendants . . . did . . . engage in an unlawful combination and conspiracy to restrain trade or commerce in this state." This amendment did no more than incorporate into the language of the indictment Judge JACKMAN's earlier order that the indictment charged an offense under the first sentence of sec. 133.01(1). In effect, the amendment

[1] At the time the indictment was handed down sec. 133.01(3), Stats. 1973, provided: "Whoever violates sub. (1) may be fined not more than $5,000 or imprisoned not more than 5 years or both." This penalty section has since been amended to distinguish between corporations and private persons. Ch. 224, sec. 111c, 1975 Wis. Laws, effective May 5, 1976.

[2] The first trial resulted in a hung verdict, and the trial judge presiding declared a mistrial.

struck the references to acts "intended to restrain competition in the supply or price of an article or commodity," leaving the allegation as to conspiracy "to restrain trade or commerce in this state."

The amendment here permitted was in the nature of a formal deletion of words, not a substitution of one charge for another. Deleted was the reference to the second sentence of sec. 133.01(1). Remaining was reference to the first sentence of that statute. The test in this state is whether the defendant was prejudiced by this change.[3] As with an information, an indictment must inform the accused of what particular acts he is alleged to have committed.[4] Notice to the accused, not perfection in draftsmanship, is the key. Thus, where an indictment enables the defendant to understand the offense charged so that he can prepare his defense, "designation even of a completely wrong statute has been held not to vitiate an information or indictment."[5] Similarly, our court refused to quash an indictment which cited a relevant statute but failed to include one element of the crime where the defendant and the jury were apprised of the elements that the state would need to prove to get a conviction.[6]

---

[3] *See:* Sec. 971.26, Stats., which provides: "No indictment, information, complaint or warrant shall be invalid, nor shall the trial, judgment or other proceedings be affected by reason of any defect or imperfection in matters of form which do not prejudice the defendant."

[4] *Liskowitz v. State,* 229 Wis. 636, 641, 282 N.W. 103 (1939).

[5] *Wagner v. State,* 60 Wis.2d 722, 728, 729, 211 N.W.2d 449 (1973).

[6] *State v. Nowakowski,* 67 Wis.2d 545, 571, 227 N.W.2d 697 (1975), this court held that: "In this case the violation in the indictment was stated with reference to the section numbers of the statutes which were alleged to be violated. The trial court in the case at bar advised the parties prior to trial that the state would have to prove intent and an instruction on intent was given to the jury. Thus the defendant was apprised of the statutory

In the case before us, the defendant was informed long before trial that the state was required to proceed solely on the theory that the defendant violated the first and not the second sentence of sec. 133.01(1). This amendment in the indictment is no foundation for a claim of prejudice. The amended indictment charged this defendant with the crime of which he was convicted, and he knew well in advance of trial what that crime was.

The important question is whether the indictment charged a crime under the first sentence of sec. 133.01 (1), Stats. The defendant contends that the state antitrust statute cannot be applied to customer allocation or price fixing in service industries because of the existence of the second sentence.[7] It is contended that because the second sentence prohibits restraints in the supply or price only of articles or commodities, garbage haulers, and others in service industries, can fix prices and allocate territories with impunity. This contention was raised in the *Milwaukee Braves Case*.[8] While the *Braves* decision ultimately rested on other grounds, as to the claim that the second sentence restricts the meaning of the first, this court concluded: "[T]he insertion of the second sentence in 1921 did not limit the broad language of the

violation with which he was charged and the elements that the state would need to prove in order to get a conviction."

[7] For legislative history of the enactment of the Wisconsin antitrust act, and the addition of the second sentence of sec. 133.01(1) in 1921, *see: State v. Milwaukee Braves, Inc.*, 31 Wis.2d 699, 715, 716, 144 N.W.2d 1 (1966), certiorari denied, 385 U.S. 990 (1966).

[8] The court stated the position of defendants to be that: "[T]he exhibition of major league baseball games is the supply of a service, not an article or commodity, and that sec. 133.01 prohibits only restraints of trade or commerce in articles or commodities. The claim is that the second sentence in the section restricts the meaning of the first and third sentences." *Id.* at 714. The court rejected this position.

first or third sentences to the types of combination described in the second."[9]

It is true, as the defendant asserts, that in the *Braves Case* the court also said: "[T]he first sentence of sec. 133.01(1), Stats., still embraces other types of restraint of trade not specifically enumerated or described."[10] But to read this sentence as meaning that all restraints "enumerated" in the second sentence are excluded from the first is not consistent with the *Braves Case* as a whole. The Major League's concerted refusal to deal with the Milwaukee Brewers was one act for which the League was convicted, and that act was a restraint on the supply of a service—baseball in Milwaukee. In the *Braves Case* we did not find that the first sentence prohibition against this restraint on trade was erased by the fact that this practice also affected the price or supply of a service. While the *Braves Case* held only that the second sentence did not, by reason of its reference to articles or commodities, limit the subject of the first sentence, we now hold that the specific activities prohibited by the second sentence are also prohibited by the first. This holding is particularly apt where, as here, the conspiracy alleged goes well beyond an agreement to fix prices. While impact upon prices is involved, conspiracy here alleged was basically an allocation of customers. One party to the conspiracy was to be given territorial-type rights to a particular customer, including state and federal agencies of government, while the other parties were to submit noncompetitive bids to insure that this allocation of "turf" was not upset. In holding that the second sentence of the statute is but one nonexclusory example of conduct prohibited by the first sentence, we are in accord with a long line of state cases holding that the broad variety of anticompetitive

[9] *Id.* at 716.
[10] *Id.* at 715.

practices prohibited by the Sherman Act[11] are illegal under the state act.[12] Acts found to be illegal restraints upon trade under the first sentence of the Wisconsin antitrust act are not decriminalized by the second section of sec. 133.01 even though they may affect supplies and prices of a service instead of an "article or commodity."

## II. *ILLEGAL ELECTRONIC SURVEILLANCE.*

Before the first and second trials there were extensive evidentiary hearings on defendant's claim of illegal electronic surveillance by the state. At the first such hearing witness Jim Pellitteri testified that on advice of his attorney he taped his telephone conversations with the defendant which he later turned over to the state and on three occasions wore a microphone given him by the state to monitor conversations with employees of the defendant. On this and other evidence adduced at the hearing Judge JACKMAN concluded that the tapes were lawful one-party consent tapes made by Pellitteri and that no other electronic surveillance was conducted by the state. Before the second trial a second evidentiary hearing was held. Jim Pellitteri also took a polygraph test to determine whether his version of the making of tapes was true. On the basis of the two hearings and the polygraph test, Judge MALONEY found that the

[11] The Sherman Act, 15 U.S.C., sec. 1 et seq. (1973), has been recognized to apply to restraints in services as well as commodities since *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427 (1932).

[12] We have stated many times that the construction of sec. 133.01(1) is controlled by federal decisions under the Sherman Act. *Madison v. Hyland, Hall & Co.*, 73 Wis.2d 364, 375, 243 N.W.2d 422 (1976); *State ex rel. Nordell v. Kinney*, 62 Wis.2d 558, 563, 215 N.W.2d 405 (1974); *John Mohr & Sons, Inc. v. Jahnke*, 55 Wis.2d 402, 410, 198 N.W.2d 363 (1972); *State v. Lewis & Leidersdorf Co.*, 201 Wis. 543, 549, 230 N.W. 692 (1930); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 625, 147 N.W. 1058 (1914).

tapes were lawful one-party consent tapes and that the defendant proved no other electronic surveillance by the state. The tapes which Pellitteri made and turned over to the state were not introduced as evidence before the grand jury or at the trial.

On this appeal defendant claims that both trial courts erred in finding no proof that the state engaged in illegal electronic surveillance. As in the granting or denying of a motion to suppress evidence, the findings of fact of the trial courts here will be sustained unless they are against the great weight and clear preponderance of the evidence.[13] This court will not substitute its judgment for that of the trial court in matters of credibility.[14]

The general rule is that evidence obtained by the state by means of an illegal electronic surveillance violates the Fourth Amendment and must be suppressed.[15] In the case before us, two trial courts found that the challenged tapes were made by Pellitteri. This finding of fact is not challenged on appeal. They are, as both trial judges found, one-party consent tapes which are not "searches" within the compass of the Fourth Amendment.[16] As to the existence of further illegal electronic surveillance by the state, both trial judges found that this did not occur. While there is contradictory evidence in the records of the two evidentiary hearings, we cannot conclude the trial courts' findings of no electronic surveillance by the state to be against the great weight and clear preponderance of the evidence.

---

[13] *Bies v. State*, 76 Wis.2d 457, 469, 251 N.W.2d 461 (1977); *State v. Pires*, 55 Wis.2d 597, 602, 603, 201 N.W.2d 153 (1972).

[14] *Turner v. State*, 76 Wis.2d 1, 250 N.W.2d 706 (1977).

[15] *See: Katz v. United States*, 389 U.S. 347, 354 (1967); *Berger v. New York*, 388 U.S. 41, 51 (1967); *State ex rel. Arnold v. County Court*, 51 Wis.2d 434, 187 N.W.2d 354 (1971).

[16] *United States v. White*, 401 U.S. 745 (1971).

The defendant also sees error in the trial court's finding that witness Pellitteri did not tape his conversations with employees of the defendant to injure defendant within the meaning of sec. 968.31(2)(c), Stats. Under that statute one-party consent tapes are lawful unless the communication "is intercepted for the purpose of committing any criminal or tortious act . . . or for the purpose of committing any other injurious act." The trial court's finding of fact was that the witness' purpose in making the tapes was to protect himself from prosecution. That finding is not against the great weight and clear preponderance of the evidence. A federal court has stated that in taping one's own telephone conversations or permitting another to do so, "[A]ll parties have a right to proceed under the law and to protect their own rights."[17] We will not disturb the trial court's finding that this witness was doing just that.

Our holding that the witness was entitled to tape his telephone conversations with the defendant's employees to protect himself from prosecution leaves the defendant little room to argue that the witness was not entitled to turn those tapes over to law enforcement authorities, as he did, in exchange for a grant of immunity. But defendant contends that this turnover is prohibited by sec. 968.29, Stats. Subsections (1), (2) and (5) of that

[17] In *Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971), the federal appeals court held: "It does seem that by using the term 'injurious act' in conjunction with 'criminal and tortious acts,' it was intended to reach certain kinds of harmful conduct which might not strictly be criminal or tortious. The scope of such harmful conduct must be determined on a case-by-case basis. However, it seems apparent from the context in which the statute was enacted that the sort of conduct contemplated was an interception by a party to a conversation with an intent to use that interception against the non-consenting party in some harmful way *and in a manner in which the offending party had no right to proceed.*" [Emphasis supplied.]

statute authorize the disclosure of the contents of authorized interceptions by law enforcement authorities for enumerated investigatory purposes. Subsection (3) of the statute permits the use of authorized interceptions by "[a]ny person . . . *only* while giving testimony under oath or affirmation in any proceeding in any court or before any magistrate or grand jury . . ." [Emphasis supplied.] The defendant contends that since Pellitteri was not himself a law enforcement officer he can use or disclose the tapes only as permitted under sec. 968.29 (3), Stats., while giving testimony under oath in a court proceeding. It claims that turning the tapes over to the state does not satisfy this rule.

In holding that one-party consent tapes are lawful in Wisconsin, a holding we here reaffirm, our court stated: "Interception is one thing; disclosure as evidence in court is another. In declaring interceptions with consent of one party 'not unlawful' the act recognizes the need of this investigative tool to detect crime, but in denying its use as evidence the statute recognizes in the balance the right of privacy of free people."[18] Therefore, in *Arnold* our court held that the admissibility of the contents of electronic surveillance was governed exclusively by sec. 968.29(3), Stats. Although one-party consent tapes are lawful, they are not "authorized by ss. 968.28 to 968.33" and therefore the contents cannot be admitted as evidence in chief.[19] But it is to the use of the contents as evidence that the limitation upon disclosure in sec. 968.29(3), Stats., applies. It is to the use of the contents as evidence that the "only under oath" requirement applies. As was held in the *Arnold Case,* it is the "admissibility into evidence of the contents of eavesdropping interceptions"

[18] *State ex rel. Arnold v. County Court, supra,* n. 15, at 442.
[19] *Id.* at 444.

that is "governed solely by sec. 968.29 (3), Stats."[20] Our court has refused to apply the *Arnold* holding so as to prohibit an undercover agent who monitored his conversation with a prostitute to testify about that conversation because, although the fruits of the surveillance were not admissible, the surveillance was not prohibited.[21] The Pellitteri tapes were not "authorized" under sec. 968.29 (3). They were turned over to a law enforcement agent and were not admitted as evidence. Sec. 968.29 (3) does not prohibit this use.

The prosecutor in his opening statements to the grand jury referred to the fact that the witness Pellitteri made tapes that he turned over to the state. The defendant claims that this reference also violated sec. 968.29 (3), Stats. However, this reference to the existence of the tapes was not a disclosure of the contents of tapes, and for the same reasons that the transfer of the tapes to the state did not violate sec. 968.29 (3), Stats., the prosecutor's reference to the tapes did not violate that statute.

Nonetheless, the reference was improper. Because under *Arnold* the tapes themselves could not be used in evidence, it was unfair for the prosecutor to refer to them.[22] However, the judge instructed the jury to disregard all comments of the attorneys, and the indictment the jury handed down is supported by testimony sufficient to establish probable cause.[23] Under these circum-

---

[20] *Id.* at 442.

[21] *State v. Smith*, 72 Wis.2d 711, 716, 242 N.W.2d 184 (1976).

[22] *Gaertner v. State*, 35 Wis.2d 159, 168, 169, 150 N.W.2d 370 (1967).

[23] *State ex rel. Welch v. Waukesha Co. Cir. Court*, 52 Wis.2d 221, 224, 189 N.W.2d 417 (1971); *State v. Lawler*, 221 Wis. 423, 435, 267 N.W. 65 (1936).

stances the prosecutor's reference to the tapes does not warrant, much less require, quashing the indictment.

### III. *SUFFICIENCY OF THE EVIDENCE TO CONVICT.*

This defendant was convicted of a conspiracy in restraint of trade under the first sentence of sec. 133.01 (1), Stats. To its contention that the state failed to prove an overt act in furtherance of such conspiracy, the short answer is that the state was not required to prove overt acts. Except for the fact that the state act applies to intrastate commerce while the federal act applies to interstate commerce, what amounts to a conspiracy in restraint of trade under the Sherman Act amounts to a conspiracy in restraint of trade under the Wisconsin antitrust act.[24]

The long-standing construction of the Sherman Act, first stated by the United States Supreme Court in *Nash v. United States,* is that proof of a conspiracy in restraint of trade does not require overt acts: "Coming next to the objection that no overt act is laid, the answer is that the Sherman Act punishes the conspiracies at which it is aimed on the common law footing—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability."[25] Thus we need not examine this record to determine whether, as the state contends, overt acts were here established by credible evidence. The state in the case at bar was required to prove only a conspiracy in restraint of trade, not overt acts in furtherance of such conspiracy.

---

[24] *John Mohr & Sons, Inc. v. Jahnke, supra,* n. 12. *See also,* other cases cited in n. 12, *supra.*

[25] *Nash v. United States,* 229 U.S. 373, 378 (1913).

Nor was the state required, as defendant contends, to prove an actual effect upon commerce. Market or customer allocation,[26] bid rigging,[27] and price fixing[28] are per se violations of the Sherman Act. Therefore, these practices are per se violations of the state antitrust act. Anticompetitive practices that are illegal per se are among those "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."[29] By reference to federal law, we hold that the state needed only to prove an agreement to fix prices, rig bids or allocate customers and did not need to prove an actual injury to competition.

The amended indictment, as did the original indictment, charged the defendant with engaging in a single conspiracy with coconspirators Pellitteri and Beecher. Judge MALONEY instructed the jury that a verdict of guilty required a finding of a single conspiracy. The defendant contends that the state failed to establish a single overall conspiracy, which has been defined by the federal court in *United States v. Varelli* to be: "Various people knowingly joining together in furtherance of a

[26] *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 574, 575 (2d Cir. 1961); *Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711, 720 (S.D.N.Y. 1969), affirmed 417 F.2d 621 (2d Cir. 1969) (per curiam).

[27] *Addyston Pipe & Steel v. United States*, 175 U.S. 211, 235–244 (1899); *United States v. Pennsylvania Refuse Removal Ass'n*, 242 F. Supp. 794, 797, 798 (E.D. Pa. 1965).

[28] *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).

[29] *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

common design or purpose."[30] According to the defendant, at best, the state proved only a series of multiple conspiracies, and therefore the defendant was not convicted for the single crime charged. In distinguishing between a single conspiracy and a series of multiple conspiracies, in *Varelli* the court held: "In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy."[31] Applying this test of common goal or purpose in the case before us, we hold that the jury could reasonably have concluded, as it did, that all three conspirators, Waste Management, Pellitteri and Beecher, conspired for the common purpose of allocating customers between them and that they rigged bids and fixed prices to accomplish this shared design or purpose.

Pellitteri testified that he and the defendant had an agreement to rig bids, allocate customers and fix prices, and that while this conspiracy continued,[32] Beecher, at Pellitteri's suggestion, contacted an employee of the defendant, Peter Abeles, and joined this conspiracy. The defendant had recently bought out two other local haulers, Eckel Sanitation and Phil Pellitteri Trucking. There was evidence that first Pellitteri, and later Beecher, entered into an agreement with the defendant in order to protect the defendant's business position during the consolidation period in return for similar favors from the defendant. This constitutes a single and continuing

[30] 407 F.2d 735, 742 (7th Cir. 1969).

[31] *Id.* at 742.

[32] Both sides agree that when Pellitteri agreed to turn over the tapes to the state on January 15, 1972, his conspiracy with the defendant terminated.

conspiracy, joined by another, for, as the *Varelli Case* holds: "New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies."[33] On this record, the jury, acting reasonably, was entitled to find one overall conspiracy, and we affirm the jury's verdict.

But even if a finding of one overall conspiracy is not supported by the record, the result is nothing more than a variance between the indictment and the proof, and the verdict must be set aside only if this variance prejudiced the defendant.[34] The defendant concedes that there was evidence, though it calls the evidence "slim," of one conspiracy to restrain trade between the defendant and Pellitteri and a second conspiracy between the defendant and Beecher. Each conspiracy is contrary to sec. 133.01 (1), Stats.

The defendant argues that if multiple conspiracies were proved, the United States Supreme Court case of *Kotteakos v. United States*[35] requires the conviction to be set aside. In *Kotteakos* thirty-two defendants were indicted as coconspirators in a single conspiracy to make fraudulent federal loan applications. Some of the defendants were convicted while other defendants were not. The government conceded that although one overall conspiracy was alleged, multiple conspiracies were proved. The Court held that it was prejudicial error to try all the defendants together, because, since the law of conspiracy permits the acts and declarations of one conspirator to bind other members of the conspiracy,[36]

---

[33] *United States v. Varelli, supra,* n. 30, at 742.

[34] *Kotteakos v. United States,* 328 U.S. 750 (1946).

[35] *Id.*

[36] *Id.* at 770. For the Wisconsin statement of the rule that evidence of the acts and declarations of one conspirator bind a coconspirator, *see: State v. Adams,* 257 Wis. 433, 43 N.W.2d 446 (1950); *Schultz v. State,* 133 Wis. 215, 225, 113 N.W. 428 (1907).

it was impossible to tell if the jury used the proper evidence in determining whether to convict each defendant.[37]

But here the charging of the defendant and one of its agents, Standridge, did not trigger the *Kotteakos* problem. Here the acts of the defendant Standridge were attributable to Waste Management, not on a theory of conspiracy but on a theory of agency. Where the only two defendants are a corporate conspirator and its agent, the *Kotteakos* problem of prejudice does not arise. No prejudice would have resulted from charging Waste Management and its agent with one conspiracy, but proving multiple conspiracies at trial.

## IV. ERRORS IN THE GRAND JURY PROCEEDINGS.

Since none of the six challenges to the grand jury proceedings involve significant issues of law, discussion of them will be summary. (1) The defendant complains that the state improperly elicited testimony of the witness Jerry Beecher that because he had heard the defendant was "a Chicago run outfit" and "linked with Mafia or whatever," he was afraid of it. The indictment was amply supported by other credible evidence. This bit of testimony was not prejudicial and is no basis to attack the indictment. (2) The defendant contends that the court's admonition to the grand jury witnesses "to inform no one of the questions asked of you and the answers given by you, except your attorney," interfered with its ability to prepare a defense. Such an admonition was proper. In this state grand jury proceedings are secret in order to protect the jurors and the public.[38]

[37] *Id.* at 771.
[38] *State v. Krause,* 260 Wis. 313, 50 N.W.2d 439 (1951).

Moreover, on appeal the defendant has not cited a single example of how it was hindered by this admonition in preparing its defense. (3) The trial judge entered the grand jury room, at the request of a witness who asked that a judge confirm the fact that he had no right to have his attorney present. The defendant argues that the presence of this "stranger" was error. But the judge's entry did "not occur at a time when the jury [was] deliberating or voting on the indictment" and "is not grounds for quashing an indictment unless prejudice to the accused is shown."[39] No prejudice to this defendant was shown. (4) The defendant claims the prosecutor was constitutionally obliged to elicit testimony concerning an exculpatory colloquy between witness Pellitteri and the defendant's general manager Standridge that is on the tapes. The contents of the tapes were not admissible under *Arnold,* and the information they contained was made available to defendants at their request before trial. That is all that was here required.[40] (5) The defendant contends that the opening and closing statements of the prosecutor should have been recorded. Under the applicable statute, grand jury proceedings need not be recorded unless so ordered at the direction of the judge.[41] (6) The defendant finally challenges the state's failure to turn over to the defendant all transcripts of grand jury proceedings. In fact the trial court turned over to the defendant transcripts of all witnesses' testimony except transcripts of witnesses whose testimony involved public officials not involved in this case. Sec.

---

[39] *State v. O'Connor,* 77 Wis.2d 261, 277, 252 N.W.2d 671 (1977).

[40] *See: Nelson v. State,* 59 Wis.2d 474, 208 N.W.2d 410 (1973).

[41] Sec. 255.13(1), Stats., provides: "Every grand jury shall *when ordered by the judge* ordering such grand jury, employ one or more competent reporters to attend their sessions and to make and transcribe a verbatim record of all proceedings had before them." [Emphasis supplied.]

971.23 (1), Stats., only requires the state to disclose to the defendant before trial the defendant's grand jury testimony.[42] The defendant's contention that the disclosure of grand jury proceedings was here insufficient is unsupported by state law.

## V. ERRORS DURING THE TRIAL.

The claims of error during the trial raised by defendant on this appeal include the following: (1) The defendant complains that the jury list for the trial did not contain the names of jurors numbered in the panel list from 87 to 141. This, the defendant claims, denied him a jury chosen by lot.[43] On the record the trial judge explained that, with the knowledge of the other circuit judges, he divided the panel list into two working units so that one unit could work for one portion of the term, and the second for another. The defendant does not allege any deliberate discrimination in the removal of fifty-five consecutive names. Even if this procedure departed from the statutory mandate, the defendant must be actually prejudiced thereby[44] and he has failed to allege or prove prejudice. (2) During the defendant's closing argument counsel referred to the lack of corroborative evidence regarding two pieces of paper on which,

[42] See also: Steensland v. Hoppmann, 213 Wis. 593, 599, 252 N.W. 146 (1934).

[43] Sec. 255.04, Stats.

[44] Pamanet v. State, 49 Wis.2d 501, 509, 182 N.W.2d 459 (1971), in which this court held: "[T]he general rule is that statutes prescribing the mode of drawing a jury panel are directory, and irregularities in carrying out such provisions are not material unless the defendant is prejudiced thereby and that is the rule followed in this state." Citing 5 Wharton's, Criminal Law and Procedure, p. 82, sec. 1956; Petition of Salen, 231 Wis. 489, 491, 286 N.W. 5 (1939); Ullman v. State, 124 Wis. 602, 609, 103 N.W. 6 (1905).

Pellitteri testified, one of the defendant's agents Abeles had written some quotations for bids. The prosecutor objected to this argument stating that, "You know very well why we couldn't get evidence on that." The record shows that at the time of trial Abeles was outside the jurisdiction of the court and was challenging extradition from Illinois, but that the jury was not told of this fact. The defendant moved for a mistrial on the grounds that the prosecutor erred in testifying about matters not in the record. The trial court struck the prosecutor's remark, but refused to grant a mistrial. We hold that the trial judge did not abuse his discretion in concluding that the defendant was not denied a fair trial by reason of this remark.[45] (3) The defendant makes many challenges to the jury instructions. The court gave an instruction involving the weight to be given the testimony of an accomplice. The defendant did not request a similar instruction involving the weight to be given the testimony of an informer. During closing arguments the trial judge told the jury that the witness Pellitteri was no longer an accomplice after January 15, 1972, the date he became an informer. The defendant contends that this statement may have led the jury to believe it could give greater weight to Pellitteri's testimony after January 15 than before. Since both parties agreed at the time of trial that Pellitteri was no longer a coconspirator after January 15, 1972, we hold that the defendant has waived any claim of error concerning the effects of the court's instructions by not requesting an informer instruction. The trial court instructed the jury that after Pellitteri withdrew from the alleged conspiracy, any declarations of Abeles and Pellitteri could not be used as evidence against the defendant Standridge unless it first found that Standridge was a member of the con-

[45] *Hoppe v. State,* 74 Wis.2d 107, 120–122, 246 N.W.2d 122 (1976).

spiracy. The defendant Waste Management claims it was entitled to a similar instruction. But Waste Management's acts are the acts of its agents, Standridge or Abeles, and any statements of Abeles or Standridge bind Waste Management as the principal and not as a coconspirator. Thus the trial court did not err in refusing the defendant's request. The defendant's objection to the instruction that a person is presumed to intend the natural consequences of his deliberate acts is without merit in Wisconsin.[46] The instruction that after Pellitteri withdrew from the conspiracy his actions could not be used against either of the two defendants was an adequate instruction on proof of conspiracy,[47] and the court was not required to give the additional instruction requested by the defendant. Because we have held in this opinion that in proving price fixing, bid rigging and market allocation the state was not required to prove an actual injury to competition, we uphold the trial court's refusal to instruct the jury that evidence of competition between coconspirators creates an inference that no conspiracy existed.

As to the other challenges to the instructions, as well as to the other challenges to the judgment of conviction, we find no basis for reversal.

*By the Court.*—Judgment and order affirmed.

[46] *See: Garcia v. State,* 73 Wis.2d 174, 183, 242 N.W.2d 919 (1976); *State v. Johnnies,* 76 Wis.2d 578, 587, 251 N.W.2d 807 (1977).

[47] *See* n. 36, *supra.*